IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

MARY A. HILL,                          )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )        CIVIL ACTION NO. 12-0245-N
                                       )
CAROLYN W. COLVIN[1], Commissioner     )
Of Social Security,                    )
                                       )
        Defendant.                     )

## ORDER

This action is plaintiff's appeal from the final decision of the Commissioner denying her

claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI")

benefits.  The parties have waived oral argument (doc. 16) and consented to the exercise of

jurisdiction by a Magistrate Judge (doc. 17).  The action has been referred to the undersigned for

all purposes (doc. 18).  Upon review of the record, including the briefs of the parties (docs. 13,

14), it is the finding of this court that the decision of the Commissioner is due to be AFFIRMED.

## Procedural History

Plaintiff initially filed applications for DIB and SSI benefits on September 15, 2005,

claiming disability beginning June 1, 2005.  This is the second appeal of plaintiff's Social

Security claims to reach this court.  The first appeal, 2:08-cv-00088-M, was filed in 2008.  In

that appeal, plaintiff obtained reversal of the adverse decision of the Commissioner on the basis

of several erroneous conclusions drawn from the record.  *See* 08-088-M, doc. 27.

_____

[1] Carolyn W. Colvin became the Commissioner of Social Security on February 14, 2013.
Pursuant to Fed.R.Civ.P. 25(d), Colvin is substituted for Michael J. Astrue as Defendant in this
action.  No further action needs to be taken as a result of this substitution.  42 U.S.C. § 405(g).

Following the denial of her first claims, plaintiff also filed a pair of protective claims for SSI and DIB which were consolidated following remand with her prior claims.  After denial of the consolidated claims at the administrative level, plaintiff requested a hearing before an ALJ. The hearing was held on November 3, 2009.  Plaintiff was represented by counsel and testified on her own behalf; in addition, a vocational expert ("VE"), Patrick Sweeney, and two medical experts, Doug McKeown, Ph.D., and James N. Anderson, M.D., were present and testified at the hearing.

On December 16, 2009, the ALJ issued a decision (doc. 11, at 231 *et seq*.) finding plaintiff was not disabled and denying benefits.  Plaintiff made a timely request for review by the Appeals Council, which denied review on February 10, 2012, (*id*. at 224) rendering the ALJ's decision the final decision of the Commissioner.  The instant appeal followed.

<u>Legal Standard</u>

<u>Scope of Judicial Review</u>

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner. Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. <u>Washington v. Astrue</u>, 558 F.Supp.2d 1287, 1296 (N.D.Ga. 2008); <u>Fields v. Harris</u>, 498 F.Supp. 478, 488 (N.D.Ga. 1980). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive. <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1439-40 (11th Cir. 1997); <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991); <u>Martin v. Sullivan</u>, 894 F.2d

1520, 1529 (11th Cir. 1990); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987); Hillsman v.

Bowen, 804 F.2d 1179, 1180 (11th Cir. 1986); Bloodsworth v. Heckler, 703 F.2d 1233, 1239

(11th Cir. 1983). "Substantial evidence" means more than a scintilla, but less than a

preponderance.  In other words, "substantial evidence" means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion and it must be enough to

justify a refusal to direct a verdict were the case before a jury.  Richardson v. Perales, 402 U.S.

389 (1971); Hillsman, 804 F.2d at 1180; Bloodsworth, 703 F.2d at 1239. "In determining

whether substantial evidence exists, [the Court] must view the record as a whole, taking into

account evidence favorable as well as unfavorable to the [Commissioner's] decision." Chester v.

Bowen, 792 F.2d 129, 131 (11th Cir. 1986). Even where there is substantial evidence to the

contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is

substantially supportive evidence" of the ALJ's decision.  Barron v. Sullivan, 924 F.2d 227, 230

(11th Cir. 1991).  In contrast, review of the ALJ's application of legal principles is plenary.  Foote

v. Chater, 67 F.3d 1553, 1558 (11th Cir. 1995); Walker, 826 F.2d at 999.

Statutory and Regulatory Framework

        The Social Security Act's general disability insurance benefits program ("DIB") provides

income to individuals who are forced into involuntary, premature retirement, provided they are

both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). The Social Security

Act's Supplemental Security Income ("SSI") is a separate and distinct program. SSI is a general

public assistance measure providing an additional resource to the aged, blind, and disabled to

assure that their income does not fall below the poverty line. Eligibility for SSI is based upon

proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). However,

despite the fact they are separate programs, the law and regulations governing a claim for DIB

and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled.  Patterson v. Bowen, 799 F.2d 1455, 1456 n .1 (11th Cir. 1986). Applicants under DIB and SSI must provide "disability" within the meaning of the Social Security Act which defines disability in virtually identical language for both programs. See 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable to

> Engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. See 20 C.F.R. §§ 404.1520, 416.920 (2010).

> (1) Is the person presently unemployed?
>
> (2) Is the person's impairment(s) severe?
>
> (3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[2]
>
> (4) Is the person unable to perform his or her former occupation?
>
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986).

---

[2] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

The burden of proof rests on a claimant through Step 4. *See* Phillips v. Barnhart, 357 F.3d 1232, 1237–39 (11th Cir. 2004). Claimants establish a *prima facie* case of qualifying disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. Id.

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity (RFC). Id. at 1238–39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. Id. It also can contain both exertional and nonexertional limitations. Id. at 1242–43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. Id. at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app. 2 ("grids") in a proper case or hear testimony from a vocational expert (VE), id. at 1239–40.

The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience. Each factor can independently limit the number of jobs realistically available to an individual. Id. at 1240. Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled." Id.

Facts and Administrative Holdings

ALJ's Determinations

In the decision from which the instant appeal is taken, the ALJ found: that plaintiff was insured through September 30, 2007; that she had not engaged in substantial gainful activity since June 1, 2005, the date of her alleged disability onset; and that she suffers from the

following severe impairments: asthma/smokers's bronchitis/reactive airway disease, hypertension, chronic low back pain treated symptomatically, carpal tunnel syndrome, major depressive disorder, and anxiety.

The ALJ further found that plaintiff did not have an impairment or combination of impairments that satisfied 'the listings,' 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

The ALJ held that plaintiff had the residual functional capacity to perform light work, with certain enumerated exceptions, and that those exceptions were not sufficient to render plaintiff disabled.  Specifically, the ALJ drew on the opinion of Dr. Anderson for a limitation on plaintiff's ability to work in a job that required repetitive use of her hands for fine work on a constant basis; on the opinion of Dr. McKeown for a marked limitation in completing complex tasks, and mild or moderate limitations on completing simple tasks, working with others, concentration, persistence and pace, and tolerating work stressors; and on the opinions of Dr. Estock for limitations on plaintiff's ability to handle detailed instructions, unless they were broken down into simple steps and she was given adequate time to practice the procedures, and on maintaining attention on one-and two-step tasks for more than two hours.

Finally, he found that there exist jobs in sufficient numbers in the national economy which plaintiff could perform and thus determined that plaintiff was not disabled.

Treatment Records

Plaintiff was first seen at West Alabama Mental Health Center ("WAMHC") on September 28, 2005.  She was diagnosed as suffering from Major Depressive Disorder, single

episode with atypical features.  Plaintiff had a history of marijuana use[3] and had been abused as a child.  The therapist noted major problems in social withdrawal, suspiciousness, anxious mood, depressed mood, and sleep disturbance, and also noted moderate problems with combative behavior, phobias, manic mood, poor judgment, and poor appetite.  Doc. 11 at 102-04, 249-54.

Plaintiff received counseling for depression and anxiety on an approximately-monthly basis at WAMHC throughout the relevant time period.  Observations listed in plaintiff's treatment notes in the administrative record showed plaintiff consistently presenting with depressed and anxious mood, commonly communicating problems with sleep and appetite, often exhibiting a flat affect, and occasional instances in which the counselor noted suicidal or homicidal ideation, weight loss, hair loss, hallucinations, delusions and suspiciousness.  Each time evaluations were performed, plaintiff was given a GAF score of 55 and the staff made the same diagnosis.

Dr. Ronne Chu has been plaintiff's family practice doctor for several years, during which time he has treated her for numerous conditions.  *See* doc. 14, at 3.  Among the treatment relevant to plaintiff's disability claims are prescribing medication for her depression and anxiety.  Further, in November of 2005, Dr. Chu ordered an MRI of Plaintiff's lumbar spine; that test revealed no abnormalities.  December 31, 2009, Dr. Chu completed a Clinical Assessment of Pain form, which contained his opinions that plaintiff's condition was such that it could reasonably be expected as a result of her pain, and that the pain was such that it would cause distraction from or abandonment of tasks.  He also stated that physical activity would greatly increase plaintiff's pain, and that medication side effects could be expected which may limit

---

[3] The ALJ states that plaintiff first went to WAMHC in 2004 for treatment of cannabis abuse.

plaintiff's effectiveness at work duties and her performance of everyday tasks.

Consultative Examinations and other medical opinions

Plaintiff was sent by the Social Security Administration to a number of consultative examinations.  In 2005, plaintiff was seen by a family practice doctor, Mohammed Nayeem, M.D., and a psychologist, Donald W. Blanton, Ph.D.  Another psychologist, Samuel H. Popkin, Ph.D., evaluated plaintiff for the agency based upon plaintiff's medical records; Dr. Popkin did not examine the plaintiff.

Dr. Nayeem saw plaintiff on November 21, 2005.  Plaintiff complained of pain in her back and neck, numbness and swelling in her hands and ankles, anxiety attacks, and depression, and related a history of mental abuse by her husband.  Based on the history provided by plaintiff, Dr. Nayeem diagnosed her with a long-standing back ache, acute anxiety attacks, and arthritis. He also diagnosed her as having a systolic heart murmur which he said was probably functional. The physical examination of plaintiff was normal.

Dr. Blanton saw plaintiff on November 23, 2005.  Apparently based on oral history from plaintiff, he opined that she suffered from anxiety and depression, as well as pain, poor sleep and appetite.  Plaintiff also stated that she was experiencing stress related to the return of children who were abused by their father, which reminded her of her own abuse.  She stated that she suffered back pain which was sometimes so bad that she could not get out of bed.  She reported that she cried often and had lost 50 pounds and had low energy. During the mental status examination, Dr. Blanton noted that plaintiff sat facing away from him, that she had a flat affect and exhibited very poor eye contact.  He found that she had limited insight, fair judgment for work and financial decisions, and logical thought processes.  Dr. Blanton diagnosed plaintiff with major depression, recurrent, and adjustment reaction with anxiety and depression.

In December 2005, State of Alabama agency psychologist Samuel H. Popkin, Ph.D., reviewed plaintiff's records and completed PRTF and Mental RFC forms based on that information.  In the PRTF analysis, Dr. Popkin diagnosed plaintiff as suffering from Major Depressive Disorder, recurrent, and Adjustment Disorder with anxiety and depression, as well as cannabis abuse, which he opined was likely "active."  He also stated that plaintiff suffered moderate difficulties in social functioning, and maintaining concentration, persistence and pace. In the Residual Functional Capacity (mental) analysis, Dr. Popkin found that plaintiff suffered moderate limitations in: carrying out detailed instructions; maintaining attention and concentration for extended periods; working in coordination with, or in proximity to, others without being distracted; performing at a consistent pace without an unreasonable number and length of breaks; completing a normal work-day or work-week without interruptions from psychologically based symptoms; interacting appropriately with the public; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without distracting them or exhibiting extreme behaviors; responding appropriately to changes in the work setting; travelling in unfamiliar places; and setting realistic goals or making plans independently.  He found plaintiff had no limitation in nine other work related areas.

On February 6, 2007, plaintiff returned for further evaluation by Donald W. Blanton, Ph.D.  It appears that this second evaluation was performed at plaintiff's request rather than that of the agency.  The record includes plaintiff's statements that she suffered from stress, anxiety attacks, nervous trouble, and significant depression and had a history of sexual abuse.  She stated further that she had trouble sleeping and cried daily, particularly at night.  Dr. Blanton conducted a mental status evaluation, noting that plaintiff was sad-looking and tense, that she had a flat

affect and that she made good eye contact.  He stated that she exhibited a depressed mood, that she related poor appetite and sleep, that she stated she had lost 35 pounds in the last six months, had low energy, few friends and no social life.  Plaintiff related that she cooks and makes the beds, but that her children perform the remaining household chores.  Dr. Blanton conducted a WAIS-II test, which resulted in IQ scores of 74 (verbal), 68 (performance scale) and 69 (full scale).  He also administered the WRAT test, from which he opined that plaintiff reads at a 4th grade level, spells at a 5th grade level, and performs arithmetic at a 6th grade level.  He assigned plaintiff a GAF score of 50, stating that plaintiff had "marked limitations that seriously interfere[d]" with her ability to understand, carry out and remember detailed or complex instructions, to respond to customary work pressures, to exercise judgment in detailed or complex work related decisions, and to maintain attention, concentration or pace for at least 2 hours.  He concluded that plaintiff's condition was likely to deteriorate if she were placed under stress.

On August 28, 2007, plaintiff was seen by David W. Hodo, M.D., a psychiatrist, at the request of the agency.  Plaintiff reported taking medications for depression and anxiety, but that they were not helpful.  Plaintiff reported feeling grouchy and 'rageful,' particularly since her Social Security claim was denied.  She denied using alcohol or drugs, stated that her daily activities were limited by pain, drowsiness from medication and depression, and reported that she had issues with weight loss or gain and decreased energy.  Dr. Hodo performed a mental status examination, noting that plaintiff was irritable and seemed angry, had a flat affect and flat speech, and seemed fairly 'pressured.'  He noted that she reported suicidal and homicidal ideation, obsessive thoughts and being consumed with the unfairness of her situation.  Dr. Hodo diagnosed plaintiff has having Major Depression with psychotic features.

On a Medical Source Opinion Form (Mental) which he completed, Dr. Hodo states that plaintiff has 'marked' limitations in her ability to understand, remember and carry out simple instructions; to deal with changes in routine work setting; to use judgment in simple one- or two-step work-related decisions; and to maintain the activities of daily living.  He also states that plaintiff had suffered a 'marked' deterioration in personal habits and a marked constriction of interests.  Dr. Hodo further stated that plaintiff suffered 'extreme' limitations in the ability to understand, remember and carry out detailed or complex instructions; to respond appropriately to supervisors and coworkers; to respond to customary work pressures; to respond appropriately to customers and the public; to exercise judgment in detailed or complex work-related decisions; and to maintain attention and concentration for periods of at least 2 hours.  He determined that plaintiff had suffered from the diagnosed problems for two to three years, and opined that her condition would deteriorate if she were placed under stress.

On May 13, 2008, plaintiff underwent a consultative examination with psychologist Nina E. Tocci, Ph.D.  Dr. Tocci conducted a mental status examination and reported that plaintiff had depressed mood, weight loss, poor appetite and anxiety, but normal affect, the ability to perform abstractions, logical thought content, good social judgment, and could make informed personal and financial decisions.  However, she noted that plaintiff could not see a connection between her anxiety and stomach problems and the imprisonment of plaintiff's son.  Plaintiff told Dr. Tocci that she suffered nightmares and panic attacks, but demonstrated little insight into her behavior or social judgment.  Dr. Tocci diagnosed plaintiff with General Anxiety Disorder and Major Depressive Disorder (moderate), and assigned a GAF score of 65.  Dr. Tocci stated that plaintiff's prognosis was 'guarded' due to her difficulties handling family issues with her children. She concluded that plaintiff "has a work history that suggests she has reached a point

with the distress in her personal/family life that she is not able to handle.  Currently, she would have difficulty concentrating on tasks, performing tasks in a timely manner and completing tasks to specification."

On May 21, 2008, plaintiff was sent to a consultative examination with Judy Cooke Travis, M.D.  Plaintiff reported that she had carpal tunnel syndrome causing her wrists to throb and ache, and that the problem was exacerbated by picking up or wringing items, making it so that she could not hold or carry things.  Plaintiff further reported that she had constant lower back pain, made worse by bending or by ten minutes of standing.  She reported that her feet swell two or three times per week, that she has asthma and had suffered an asthma attack once so far that year, that she had headaches, hair loss, a depression and anxiety with nightmares, difficulty sleeping and a fair appetite.  Dr. Travis conducted an examination which showed a flat affect, decreased mobility in the lumbar spine and tenderness to percussion over the lumbar musculature, normal gait, normal extremities and mostly normal back.  Dr. Travis diagnosed plaintiff has having a visual impairment which was corrected with glasses, depression with anxiety, lower back pain, a history of carpal tunnel syndrome, asthma, hypercholesterolemia, and tobacco use.  She recommended an x-ray of plaintiff's lumbosacral spine and a psychological evaluation prior to any determination of disability.

In May 2008, State of Alabama agency physician Richard Whitney, M.D., reviewed plaintiff's records and provided a short summary.  Doc. 11, at 480.  He gave an opinion that plaintiff's pain levels would not be expected from her condition.

On May 28, 2008, Dr. Robert Estock, M.D., a State of Alabama psychiatrist, completed a second Mental RFC form based on his review of certain records.  He stated that plaintiff had mild restrictions in activities of daily living, moderate difficulties in maintaining social

functioning, moderate difficulties maintaining concentration persistence or pace, an no extended episodes of decompensation. He gave his opinion that plaintiff had moderate limitations in her ability to understand and remember detailed instructions, to carry out detailed instructions, and to maintain attention and concentration for extended periods.  He stated that he believed she could "remember locations and work like procedures;" "understand, remember and carry out short simple instruction;" and "maintain attention sufficiently to complete simple 1-2 step[] tasks for periods of up to 2 hours without special supervision or extra rest periods." Id. at 484.  He further opined that "[s]he may have moderate difficulty handling more detailed instructions but likely can handle even these if they are broken down into simple 1-2 step tasks and she is given adequate rehearsal." Id.

Expert Hearing Testimony

In addition to the Vocational Expert, the ALJ had two expert medical witnesses on hand to offer testimony at the 2009 hearing.  James Miller Anderson, M.D., testified concerning plaintiff's physical condition. Douglas McKeown, Ph.D., was offered as an expert on mental health matters.  Drs. Anderson and McKeown reviewed portions of the record prior to the hearing; neither of them examined plaintiff, though both were present at the hearing as she testified.

Dr. Anderson testified that plaintiff had been treated symptomatically for chronic lower back pain, but had a normal MRI of her lumbar[4] spine in 2005.  She had bilateral hand pain thought to be carpal tunnel syndrome, a history of shortness of breath and chest pain, a diagnosis of asthma and smoker's bronchitis, as well as hypertension which was asymptomatic.  He gave

---

[4] In light of a notation of 'inaudible' at this point, and the medical records described above, this likely should read "lumbosacral spine."

the opinion that she would be limited to light work with minimal hand restrictions, no repetitive use of the hands for fine work on a constant basis. He stated his opinion that plaintiff's symptoms did not equal any listing. Doc. 11 at 616-18.

Dr. McKeown testified that plaintiff had been followed by WAMHC for anxiety and depressive symptoms since April 2004, and that their records indicated that plaintiff;s problems related to family problems and conflict. He reiterated Dr. Tocci's findings, including the GAF score of 65, and her medications. He indicated that he believed plaintiff was "basically stable on those medications with the symptoms considered to be primarily chronic from a mental health standpoint." Id. at 620. He stated that plaintiff's symptoms would not meet the requirements of a listing, presumably Listing 12.04 which he had previously mentioned, but would suggest "mild impairments in activities of daily living, social functioning and concentration, persistence and pace, no identified episodes of decompensation in work like setting over the past 18 months." Id. In addition "[f]rom and RFC standpoint, one would consider likely marked impairments for completing complex tasks, moderate impairment for tolerating work stresses, mild impairment for completing simple tasks, mild impairments for working with supervisors, coworkers and the general public, and concentration, persistence and pace would be mild to moderate primarily because of the multiple medications." Id.

*Claims on Appeal*

Plaintiff's Brief (doc. 13) raises four claims of error in the Commissioner's decision:

1.     The ALJ erred in ignoring the opinion of the plaintiff's treating physician;

2.     The ALJ erred in rejecting the opinion of every examining physician or psychologist, and adopting the findings of only non-treating, non-examining sources;

3.      Plaintiff "should be found disabled" on the basis of Listing 12.04; and

4.      The ALJ erred in finding Ms. Hill could perform jobs that did not satisfy the residual functional capacity he assigned.

*Analysis*

*ALJ Ignored Opinion of Treating Physician*

Plaintiff's first claim is that the ALJ erred in ignoring the opinion of the plaintiff's treating physician.  The claim arises from the Clinical Assessment of Pain form completed by plaintiff's treating physician.  The report was completed on December 3, 2009.  The ALJ did not mention the report in his decision of December 16, 2009, which forms the basis of plaintiff's claim that he erred by failing to explain why he did not give substantial or controlling weight to that opinion by a treating physician.  However, it does not appear from the record that the agency received that report prior to issuance of the decision.

In her Brief (doc. 13), the Commissioner points out that the record does not contain evidence that the CAP form was submitted prior to the issuance of the ALJ's decision.  The court notes that the copy of the report contained in the administrative record (doc. 11 at 230) includes a notation printed at the top showing that it was faxed to the agency on January 4, 2010.  The ALJ issued the decision denying plaintiff's claim for benefits on December 16, 2009, approximately three weeks prior to that submission.  On the same day plaintiff's counsel faxed the report, he also faxed a letter to the Appeals Council (id. at 231) which recites that he had previously submitted a copy of the report on December 4, 2009.  However, no entry exists in the administrative record to support that assertion.

Plaintiff may claim to have submitted the report to the ALJ earlier than the faxed copy, but has not made such a claim in her Brief and has offered no evidence of such prior submission.

Further, the transcript of the hearing contains no request by plaintiff's counsel to keep the record open to allow submission of supplemental medical records, nor any authorization by the ALJ for such supplementation of the record.  *See* Doc. 11 at 222.  Plaintiff has not demonstrated any deficiency in the ALJ's handling of the opinions contained in this report, as it does not appear to have been submitted to the ALJ prior to entry of the adverse decision.  The ALJ thus can not be said on the record presented to have improperly rejected the opinion.  This claim is without merit.

*Reliance on Nonexamining Mental Sources*

Plaintiff claims that the ALJ erred by rejecting the opinions of every psychologist or psychiatrist who treated or at least examined plaintiff, and by adopting instead the opinions of nonexamining sources.  This formulation is not an accurate description of the basis for the ALJ's decision.

There is a presumptive credibility hierarchy among different sorts of medical opinions. The preferences are common-sensical.   The ALJ is to consider a number of factors in determining how much weight to give to each medical opinion: (1) whether the doctor has examined the claimant; (2) the length, nature, and extent of a treating doctor's relationship with the claimant; (3) the medical evidence and explanation supporting the doctor's opinion; (4) how consistent the doctor's "opinion is with the record as a whole"; and (5) the doctor's specialization. 20 C.F.R. §§ 404.1527(c), 416.927(c).   All things being equal, treating sources are generally entitled to more weight than non-treating sources, especially where there is a long-standing treatment relationship and thus 'longitudinal' familiarity with a patient's condition; examining sources are entitled to greater weight than opinions from those who have never seen the patient; specialists are entitled to greater deference than non-specialists in their area of expertise; and

doctors' opinions are entitled to greater weight than non-doctors.  Circumstances may alter these general rules in a particular case.  Plaintiff argues that the ALJ improperly preferred the opinions of non-examining sources to those of examining or treating sources.

The ALJ found that plaintiff had a well-established history of depression; he further held that plaintiff's condition "appears well controlled with treatment."  Doc. 11 at 243.  Plaintiff received monthly counseling at the West Alabama Mental Health Center ("WAMHC").  After plaintiff began having additional problems in February 2006, including suicidal and homicidal ideation without any plan to follow up on those feelings; she signed a no harm contract and was seen once a week for a few weeks.  Id.[5] The ALJ noted that plaintiff was not regularly seen by a psychologist or psychiatrist at WAMHC, but that her regular doctor, Dr. Ronnie Chu, prescribed her medications so she did not require a psychiatrist for that purpose.   Further, WAMHC evaluated plaintiff on multiple occasions under the global assessment of functioning standard, giving her a GAF score of 55 each time.[6]  Id.

The ALJ stated that, of the opinion evidence on plaintiff's mental impairments and residual functional capacity, he gave

> significant weight to Drs. McKeown's, Gardner's, Popkin's, Estock's, and Tocci's opinions regarding the severity of claimant's impairments and her mental functional abilities/limitations.  These psychologists generally agree that the

---

[5] She may also have attended on a bi-weekly basis in August of 2009, following her July 31, 2009, session.  However, as the ALJ stated, the administrative record does not contain treatment notes for a session two weeks later.  Doc. 11 at 244.

[6] The ALJ noted that a GAF score of 51-60 represent moderate symptoms or moderate difficulty in social occupation or school functioning.  Id. at 243 n.4.  As plaintiff points out, the Commissioner has stated that GAF scores do not have "a direct correlation to the severity requirements in our mental disorder listings." Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,764-65 (Aug. 21, 2000).  However, the Commissioner considers GAF scores to be 'additional functional information' that a treating source may be able to provide.  Id.

claimant has no more than mild to moderate limitations in her ability to perform the mental demands of "basic" work activities. Dr. McKeown reviewed the longitudinal record and listened to hearing testimony. The undersigned has taken Dr. Tocci's opinion—that claimant would have difficulty concentrating on tasks, performing tasks in a timely manner and completing tasks to specification—into consideration in forming the residual functional capacity by incorporating Dr. Estock's Mental Residual Functional Capacity Assessment, which limits claimant to short, simple 1-2 step tasks/instructions.

The undersigned gives little weight to Dr. Hodo's and Dr. Blanton's opinions regarding claimant's mental functional abilities/limitations for the following reasons: First, Dr. Hodo and Dr. Blanton rely heavily upon claimant's subjective reports in forming their conclusions. For example, her reports of weight loss, as previously noted, are not supported by the medical record. Her reports that she no longer used illicit drugs (ie. marijuana) are contrary to a recent drug screen positive for THCA. Second, their opinions that the claimant has marked and or extreme limitations in her ability to perform the mental demands of basic work activities is contrary to mental health treatment records which contain multiple current GAF scores and highest GAF past year scores of 55. These scores represent moderate symptoms or moderate impairment in social and occupational functioning.

Id. at 247.

Of the experts favorably cited by the ALJ, only Dr. Tocci actually conducted an in-person evaluation of the plaintiff. The ALJ rejected the opinions of Drs. Hodo and Blanton[7], two agency-hired experts who examined plaintiff and provided reports of what they believed her limitations to be. However, in reviewing an ALJ's findings, the court must determine whether the decision reached by the ALJ is supported by substantial evidence. In this instance, it appears that the opinions of Drs. McKeown, Gardner, Popkin, Estock and, to the extent relied on by the ALJ, the opinion of Dr. Tocci, provide an amply substantial basis for the ALJ's determination.[8] In addition to these opinions, the ALJ relied upon the treatment notes from WAMHC, as well as

---

[7] Dr. Blanton also evaluated plaintiff prior to the second hearing on behalf of the plaintiff.

[8] The ALJ's determination is not based solely upon an evaluation by a non-examining source, in preference to treating physicians, but upon a variety of examining and non-examining sources including the two expert witnesses who had an opportunity to view the plaintiff during the hearing.

statements from the plaintiff concerning her activities of daily living and other matters.  The ALJ addressed plaintiff's credibility at some length and used his conclusions on her credibility to discount medical opinions which he deemed to have been based too thoroughly on plaintiff's subjective statements.

The ALJ also relied, in large part, on the plaintiff's GAF scores from various sources.  As noted above, such scores are not to be considered to be equivalent to the severity designations used in Social Security evaluations but are considered to provide useful information on plaintiff's functioning.  While the distinction between a score of 55 and a score at or below 50[9] can not be said to be compelling evidence that plaintiff is only moderately limited, the court can not find that such a distinction is not at least some evidence in opposition to plaintiff's claim to suffer greater limitations.  In light of all evidence cited by the ALJ and the record as a whole, the court finds that there is substantial evidence in the record to justify the ALJ's RFC determination and his rejection of contrary opinions.

*Applicability of Listing 12.04[10]*

Plaintiff argues that the ALJ erred by failing to find her disabled pursuant to Listing 12.04, . 20 CFR Pt. 404, Subpt. P, App. 1.  That listing addresses affective disorders, which are "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome."  Id.  The listing applies if a claimant satisfies the first two prongs or the third prong.  The ALJ considered that listing and found that plaintiff did not satisfy its requirements.

---

[9]   Only one source rated plaintiff at a 50; the ALJ was within his rights to discount that single score as an aberration.

[10]   The Commissioner did not address this argument in her brief (doc. 14).

The first prong of the listing requires a showing of depressive syndrome, manic syndrome or bipolar syndrome; only the first of these is arguably applicable to plaintiff.   Under the depressive section of the first prong, a claimant must demonstrate at least four of the following: (1) anhedonia or pervasive loss of interest in almost all activities; (2) appetite disturbance with change in weight; (3) sleep disturbance; (4) psychomotor agitation or retardation; (5) decreased energy; (6) feelings of guilt or worthlessness; (7) difficulty concentrating or thinking (8) thoughts of suicide; or (9) hallucinations, delusions or paranoid thinking.   Plaintiff argues that the evidence demonstrated that she satisfied almost all of those requirements.

The ALJ stated generally that that "the severity of claimant's impairments does not meet the specific requirements" of that section.   Doc. 11, at 237.   In the absence of a specific administrative finding to the contrary, the court finds that plaintiff's evidence clearly satisfies at least four of the elements of the first prong.

Under the second prong, plaintiff must show that the conditions found in the first prong caused at least two conditions in the second prong: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration.   Plaintiff argues that, under her version of the facts, she satisfies this prong, as well.   She states in her brief, doc. 13 at 19-20, that she suffers marked restrictions in activities of daily living, maintaining social functioning, and concentration, persistence and pace.   Though the ALJ did not make specific findings on these elements, the ALJ elsewhere rejected plaintiff's claims on some of these elements.

Specifically, the plaintiff argues that her answers on the Physical Activities Questionnaire and the Daily Activities Questionnaire, her complaints to Dr. Blanton as reflected in his notes,

and her hearing testimony were sufficient to demonstrate a marked restriction to the activities of daily living and maintaining social functioning.  The common aspect to all such evidence is that it is based on plaintiff's statements; the ALJ found that plaintiff was not credible about several facts in the course of her disability claims, and declined to accept her testimony concerning her limitations directly or through her doctors.  It would have been supportable under the under the record presented for the ALJ to discount plaintiff's statements and to find that plaintiff's was not as limited in her activities of daily living as she claims.  Such a finding would be consistent with the ALJ's stated basis for holding that plaintiff did not satisfy Listing 12.04.  Plaintiff cannot show that the ALJ's implicit determination that she did not suffer marked impairments in activities of daily living and/or social functioning were not supported by substantial evidence.

Plaintiff also argues that her claim on the Daily Activities Questionnaire that she sometimes forgot to take her medication, the opinions of Drs. Hodo and Blanton that she would have difficulty maintaining attention, concentration, and pace for periods of at least two hours, and the opinion of Dr. Tocci that she would have difficulty concentrating on tasks, performing tasks in a timely manner, and completing tasks to specification, were adequate to demonstrate that she suffered marked difficulties in maintaining concentration, persistence or pace.  Again, the ALJ indicated that he did not find plaintiff's testimony credible, and he rejected the opinions of Drs. Hodo and Blanton.  The court questions whether, if believed, these facts established that her limitation in this area rose to the "marked" level as that term is defined; given the ALJ's credibility determination as to plaintiff's testimony, and his rejection of the opinions of Drs. Hodo and Blanton, only Dr. Tocci's opinion would necessarily be applicable to this element of the second prong.  That opinion alone, if fully accepted, does not appear to support a finding of "marked" limitation in this area.  Given the lack of any such finding by the other medical sources

cited in the record, the court finds that plaintiff has failed to demonstrate that the ALJ's decision on this prong was not supported by substantial evidence.

Plaintiff raises no claim that she should have been found disabled under the third prong of this listing. Thus, based on the plaintiff's failure to demonstrate that the ALJ's findings on the second prong were not supported by substantial evidence, plaintiff's claim that the ALJ erred by finding that she did not satisfy Listing 12.04 fails.

*Residual Functional Capacity Inconsistent With Jobs Cited*

Plaintiff next argues that the ALJ determined she could perform jobs which did not satisfy the limitations the ALJ found in the residual functional capacity he assigned to her. As noted above, the ALJ held that plaintiff could perform light work with limitations identified by Drs. Anderson, Estock, and McKeown. Dr. Anderson expressly limited plaintiff from jobs requiring repetitive use of the hands for fine work on a constant basis. Drs. Estock and McKeown both opined that plaintiff was limited[11] in maintaining social functioning, maintaining concentration, persistence or pace. In addition, Dr. Estock stated that plaintiff suffered moderate limitations in the ability to understand, remember and carry out detailed instructions and to maintain attention and concentration for extended periods. Dr. McKeown testified that plaintiff suffered a marked impairment in the ability to complete complex tasks, moderate impairment in the ability to tolerate work stresses, a mild to moderate impairment of concentration, persistence and pace, and mild limitations in her ability to completing simple tasks, and in working with supervisors, coworkers and the public.

---

[11] There were differences of opinion between the doctors on how significantly plaintiff was limited in these areas.

The ALJ relied on testimony from the vocational expert to find that plaintiff could perform jobs such as retail sales, waitress, and production assembler of small products despite these additional limitations.  However, the ALJ did not make specific findings concerning how the difficulties identified by Dr. McKeown translated into specific limitations to job-related tasks; however, the limitations he found paralleled those found by other physicians for which specific job-related limitations had been addressed.[12]

Nonetheless, plaintiff's argument on this point fails.  The ALJ relied on the testimony of the VE in finding that plaintiff could perform these jobs.  The VE determined that plaintiff could perform jobs in retail sales, or as a waitress or small product assembler.  The VE was present at the hearing and the ALJ's hypothetical specifically required the VE to apply the limitations mentioned in the reports of Drs. Estock and McKeown, doc. 11 at 625; the VE specifically stated that those jobs would be performable despite the limitations set out in Dr. Estock's report and Dr. McKeown's testimony.  Id.

Plaintiff argues that the retail sales job requires "making judgments" and concludes is "contrary to Dr. Estock's limitation of plaintiff to short simple instructions."  Doc. 13 at 20.  Dr. Estock opined that plaintiff could likely handle more complex tasks with careful explanation and adequate practice.  It is not so clear to the court that the "judgments" which might be required in retail sales positions are necessarily contrary to plaintiff's limitation to simple instructions; plaintiff offers no citation to medical authorities, regulations or case law which would support his point.  However, even were the court convinced that plaintiff was correct concerning the

---

[12] Plaintiff argues that, because Drs. Estock and McKeown assigned different levels of impairment for several of the limitations they addressed, their opinions cannot be reconciled.  In the absence of specific job limitations, the distinctions between these opinions do not equate to contradictions in the job-related limitations.  The court finds no error apparent in the ALJ's determination of plaintiff's limitations.

retail sales jobs, that putative error would not alter the finding that she could perform jobs as a waitress or small product assembler, and thus would not alter the denial of benefits.

Plaintiff also argues that the waitress and assembler positions would "require frequent handling and performing repetitive work, which is contrary to Dr. Anderson's limitations to no repetitive use of the hands."  Doc. 13, at 21.  However, this misstates Dr. Anderson's opinion. Dr. Anderson testified that plaintiff would be restricted from "repetitive use of the hands for fine work on a constant basis."  Doc. 11, at 618.  Plaintiff's argument ignores both the "fine" work and "constant" basis, and thus is without merit.  Plaintiff has failed to demonstrate that the ALJ's determination that there are jobs in the national economy which plaintiff could perform is erroneous.

Conclusion

For the foregoing reasons, it is hereby ORDERED that the final decision of the Commissioner denying benefits is AFFIRMED and that judgment shall be entered in favor of the defendant.

DONE this the 5th day of June, 2013.

/s/ Katherine P. Nelson
KATHERINE P. NELSON
UNITED STATES MAGISTRATE JUDGE